UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

-vs-                            Case No. 19-CR 20425
                                  Hon. BERNARD FRIEDMAN

MARIO JACKSON,

     Defendant.

_____/

**MOTION TO SUPPRESS EVIDENCE AND
REQUEST FOR *FRANKS* HEARING**

     Now comes Defendant Mario Jackson and moves this Court to suppress evidence that was obtained pursuant to search warrants that lacked probable cause and or contained false and misleading statement requiring this Court to conduct a Franks Hearing.

     Concurrence from the Government was sought and the same was denied

                                Respectfully submitted,

Dated: February 1, 2021

                                By: /s/*Mark H. Magidson*
                                  MARK H. MAGIDSON (P25581)
                                  Attorney for Defendant
                                  One Park Avenue, Suite 1207
                                  Detroit, MI 48226
                                  (313) 963-4311
                                  mmag100@aol.com

**BRIEF IN SUPPORT OF DEFENDANT'S**
**MOTION TO SUPPRESS  EVIDENCE**

I.     FACTUAL STATEMENT

Defendant is charged with a 12-count indictment alleging five counts of crimes of

violence in violation of the Hobbs Act, 18 U.S.C. §1951 and five counts of "during and in

relation to a crime of violence used or carried a firearm" in violation 18 U.S.C. §924(c) and,

Felon in Possession of a Firearm, contrary to 18 U.S.C. §922(g)(1). The allegations in the

Indictment are that Mr. Jackson robbed or attempted to rob at gunpoint five Walgreen Drug

stores in the Detroit metropolitan area. These alleged robberies occurred for the most part on

different days and different cities.

The Walgreen stores were all equipped with security video, and it appears that in

some one video, the person who allegedly committed the robberies appeared to be talking on

a cell phone, or at least had a phone in his hand. The Government concluded that if the

perpetrator of these acts had a cell phone, then his cell phone number might appear on nearby

cell towers serving the area of the Walgreens.  Consequently, the Government sought and

obtained through  search warrants, various "cell towers dumps" from numerous providers,

cell tower data from nearby cell towers for each of the robberies.

Based upon that data, the Government claimed to have found a common number in

two out of the five locations. The Government then, based on that, obtained search warrants

to track his phone and to search a residence and to search his phone.  The affiant stated in the

affidavits to obtain these warrants that the cell tower data was in effect true and accurate and that the judge that signed the warrants had no reason or basis to question the accuracy and reliability of those allegations that in effect, assert that Jackson's phone was in the store and/or in immediate proximately to the robbery.

In the Affidavit in support of the application for the warrant to obtain the cell tower data, (Exhibit A-Affidavit of Paul Kinal) the affiant made misleading and overbroad assertions that if were removed would have resulted in the magistrate judge not finding probable cause to issue the warrant. These assertions include:

## JANUARY 9, 2019 WARRANT

1) The Affiant stated during his career in law enforcement he has been involved in numerous criminal investigations, including firearms violations, assaults, homicides, robberies and narcotics investigations.

2) Nowhere does the Affiant mention any specialized training, certification or experience in interpreting, analyzing or examining cellular evidence with regards to any of these investigations he has conducted.

3) The Affiant provides an Introduction, by articulating a series of armed robberies at several Walgreen throughout the Detroit area.

4) The Affiant cites *Riley v. California* as his reason to assume this suspect may be in possession of a cellular device at the time of these robberies without citing or referring to any local data or information.

5) The Affiant attempts to explain in Section. III of his affidavit titled, "CELL TOWERS" by writing, "Many cellular service providers maintain antenna towers ("Cell towers") that serve a specific geographic areas.  In this matter before the Court, there are multiple telecommunication providers, such as Sprint, ATT, T-Mobile/MetroPCS all having their own proprietary services, which vary from one carrier to the next.  There is no uniform standard throughout all the service providers.  When the Affiant uses the term many, he is also indicating there are those who may not.

6) Agent Kinal next claims, "Each cell tower receives signals from wireless devices, such as cellular phones, in its general vicinity.   These cell towers allow the wireless devices to transmit or receive communication, such as phone calls, text messages, and other data.  The tower closest to a wireless device does not necessarily serve every call make to or from that device.

7) When Agent Kinal claims "*such as cellular phones*", he does not identify what other electronic devices he is referring to, which may be utilizing a given cellphone tower.

8)   The tower closet to a wireless device does not necessarily serve every call make to or from that device and Agent Kinal fails to disclose that the events being investigated all occurred in the late evening hours, meaning there would be dozens of other cellphone towers in play, due to the minimalized cellular congestion on all the active towers at the time being examined, or analyzed.

9) The Affiant failed to disclose that there was a broad uncertainty to how many towers would have had to be examined, due to the urban topography of metropolitan Detroit.

10) The Government has relied on Detective Paul Kinal as the Applicant in obtaining cellular information from multiple service providers with the use of a federal search warrant dated April 28, 2019.

11) Detective Kinal is an employee of the Southfield Police Department, currently on assignment with the Oakland County Gang and Violent Task Force, oversaw by the Federal Bureau of Investigations.

12) Detective Kinal has previously represented himself to the Court to have the necessary training and experience to seek certain records, in the case a "Tower Dump".

13) Detective Kinal served search warrants on multiple telecommunication providers, demanding each company to search their business records for all cellular phone calls, which had interacted with the nearest cellular tower to each of the five (5) armed robberies.

14) As the Government's Applicant, Detective Kinal states, "Many cellular service providers maintain antenna towers ("cell towers") that serve specific geographic areas. Each cell tower receives signals from wireless devices, such as cellular phones, in its "**general vicinity**". These cell towers allow the wireless devices to transmit or receive communications, such as phone calls, text messages, and other data. The Tower closest to a wireless device **does not** necessarily service every call made to or from that device."

15) Detective Kinal is right, the tower closest to the wireless device does not necessarily service every call made to or from that device.

16) Detective Kinal relies solely on the cellular provider to identify the tower closest to each of the Walgreen locations being investigated.

17) Since the metropolitan area of Detroit is an urban population the coverage area of each cellular tower will be approximately ¼ to ½ mile in radius coverage, due to the density of population of those customers in an urban setting.

18) The time of day being examined will affect the number of cellular phones interacting with a particular cellular tower.  The later in the evening, the less congestion the airwaves, which allow the RF signal of the cellular device to choose another neighboring tower, which may not necessarily be the closets tower.

19) Detective Kinal touches on these variables when he describes the uncertainties of cellular analysis, but he did not take this into account when tasking the cellular providers to conduct only one (1) Tower Dump, on the closets tower to each of the crimes being investigated. Detective Kinal should have requested a search of approximately 3-5 towers, which would serve the area of the incident.   This area is commonly referred to the "Neighboring Tower Indices", which is a grouping of cellular towers, which could feasibly provide the coverage area of the urban setting being investigated.

20) Detective Kinal did not ascertain from any of the cellular service providers if any towers serving the location in question were "shut down" for routine maintenance. This would affect the cellular devices interacting with the next closets towers, which would be a further distance away.

21) In paragraph 28 of Detective Kinal's search warrant application he states, "…these records may include the telephone call number and unique identifiers for the wireless device in the vicinity of the tower that made or received the communications.  However, the vicinity can be the range of a number of neighboring towers in a certain market, again 3-5 towers.

22) Detective Kinal further writes in paragraph 28 of the search warrant application, "The "sectors" (i.e. the faces of the towers) that received a radio signal from the locally served device."  This information was misleading in that:

    a.  Cell Towers have three (3) affixed antennas, which are typically placed 120 degrees apart, forming the complete coverage area of 360 degrees.

    b.  These affixed antennas are what receive the RF signal from the cellular device, not the "sectors".   Sectors are formed in theory from one antenna to the next.

    c.  The cellular phone does not interact with "sectors", they interact with one of the three (3) antennas.

23) TFO Kinal attempts to explain in his affidavit that "Cellular service providers routinely maintain historical cell tower log information, including records identifying the wireless telephone calls and communications that used a particular tower", yet he adds, "these records "may include the telephone call number and unique identifiers for the wireless device in the vicinity of the tower that made or received the communication".  TFO Kinal claims are ambiguous and uncertain.

24) The Government has amassed a great deal of discovery including cell tower charts and data allegedly showing Defendant's cell phone in the vicinity with the assistance of Detective Kinal.

25) However, on or about, January 10, 2019, when AT&T complied with Detective Kinal's search warrant.  In their response, AT&T provided a lead sheet, indicating that NO cell site information was authorized under "legal authority".  If this is true, then they were unable to

provide any useful information to Detective Kinal due to him not meeting their legal threshold.

26) Further, on or about, January 15, 2019, Sprint responded to Detective Kinal's search warrant. Sprint's response to Detective Kinal, "Your request did not provide specific towers to be searched or provide a radius for the search. Enclosed you will find records for the 3 nearest towers to your requested locations. Should this be insufficient, government will need to contact our office immediately and provide to us a written request with expanded search radius."

27) Both AT&T and Sprint posed legal issues with Detective Kinal's request for information, which is reflected in their response to his request for "Tower Dumps".

28) Based upon that data, the Government ultimately obtained search warrants to track his phone and to search a residence and to search his phone. The affiant stated in the affidavits to obtain these warrants that the cell tower data was in effect true and accurate and that the judge that signed the warrants had no reason or basis to question the accuracy and reliability of those allegations that in effect, assert that Jackson's phone was in the store and/or in immediate proximately to the robbery.

29) Detective Kinal should have conducted Tower dumps on at least 3-5 additional cellular towers around each of the Walgreen Robberies; he did not.

30) Detective Kinal should know, and failed to disclose, that an RF signal will interact much differently with the nearest Cell Tower depending on the any of the following:

        a) Time of day.

i.   The later in the evening, the less cellular congestion, which allows an RF signal to travel farther.

ii.  Time of year.

iii. The fall/wintertime will affect the ability for of a cellular device to interact with the nearest cellular tower.  The weaker the battery life, the less resistance.

Urban vs. Rural Settings

iv.  Urban settings will have more density of cellular towers, to provide the necessary coverage, as opposed to rural settings, which can be up to 5-10 miles away in distance.

c Topographic areas that affect the RF signal of a cellular device.  Buildings, bodies of water and physical heights of cellular towers can affect the accuracy of information provided by the cellular companies.

31) Detective Kinal should have taken all of these into consideration, given the fact that the event being investigations, occurred in the late evening hours in late December in an Urban Settings; therefore, Detective Kinal and his peers, should have conducted a Tower Dump Search on 3-5 additional cellular towers in the "Neighboring Towers Indices", for each of the Walgreens' located in all five locations, not just the closet tower.

a)   Detective Kinal analysis was limited because he did not take into account all the possible towers in play during each of the incidents being investigated.

b) Cell Tower evidence obtained by the Government is the key to the Government's case, because the cell tower "dumps" allegedly revealed a number associated with Mr. Jackson, according to the Government.

c) It is expected that S/A Rienerth with testify to the cell tower data and records obtained from Detective Kinal of the Southfield Police Department, who was the Applicant serving the search warrants on the cell tower companies.

d) It is expected that he will testify to his analysis, opinions and conclusions regarding those records and data and then use software or other information to plot the location and movement of a cellular phone.

e) Mr. Jackson rejects that the records obtained from Detective Kinal are accurate, nor any information provided from Detective Kinal to S/A George Rienerth, to be accurate because Detective Kinal did not understand the basic interactions of an RF signal from a cellular device to the affixed antenna, not the sector, of the nearest cellular tower.

f) Detective Kinal simply did not understand the basics of cellular analysis, when he served a broad search warrant to multiple telecommunication providers, who all have their own proprietary way of retaining cellular call detail records (CDRs), thus underscoring the importance of serving a specific search warrant for each telecommunication provider, which was not done in this case.

g) AT&T and Sprint both expressed problems with TFO Kinal's Tower Dump warrant.  The defense does not find any further attempts by the Government to

further provide additional information to either AT&T or Sprint to provide

additional information for each of the carriers to even conduct a proper search.

h)  To aid the Government in explaining and presenting this vast array of

sophisticated technology to the jury, the Government is using the information

obtained by TFO Kinal (Applicant) and providing said information to an FBI

expert, who is, upon information and belief, S/A George Rienerth.


i)  Mr. Jackson rejects that S/A George Rienerth testimony meets the

relevance and reliability requirements of FRE 403, 702 and *Daubert v.*

*Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 125 L. Ed. 2d 469

(1993) because: (A) S/A George Rienerth does not possess the

scientific, technical or other specialized knowledge to be an expert,

and, (B) The proposed testimony is not based upon scientific facts or

data, is not the product of reliable principles and methods, and is not

based on reliability applied principles and methods on the facts of this

case.

j)  The Government's cell tracking evidence is not reliable and any

probative value is substantially outweighed by the danger of unfair

prejudice because when, why, and where a particular cell phone

connects to a particular cell tower cannot be sufficiently established by

cell tower records and the testimony will lead the jury to speculate as

to the reliability and accuracy of the purported facts, thus causing the jury to be misled.

k)   This Court is the "gate keeper" of the evidence and in order to perform that duty, the court should conduct an evidentiary hearing to determine the reliability and trustworthiness of this evidence and or whether it will tend to mislead the jury.

## T-MOBILE SEARCH WARRANT

33.  On or about, April 24, 2019, Deportation Officer (DO) Christopher McClain provided an affidavit in support of an application for a search warrant for T-Mobile.  DO Christopher McClain stated in his affidavit, "I have experience in the investigation, apprehension and prosecutions of individuals involved in federal criminal offenses, the use of cellular devices to commit those offenses, and the available technology that can be used by law enforcement to assist in identifying the users of cellular devices and their location." (EXHIBIT B)

34. DO McClain further states "There is reason to believe the Target Cellular Device is currently located in the Eastern District of Michigan and is being used locally because JACKSON-the user of the Target Cellular Device-is currently on parole with the State of Michigan in this district, the number is associated with JACKSON (as described below), and the Target Cellular Devices is associated with an address in and has an area code associated with Detroit, Michigan.  Historical cellular tower dumps, obtained from a previous search warrant, *also show* that the Target Cellular Device used cellular towers that service the area of the two

armed robberies that took place on December 29, 2018, at Walgreens in Southfield and Royal Oak, Michigan." This Affidavit is misleading and suspect in that:

a) It appears that DO McClain already had a nexus, or strong belief, that this target number may be associated with Defendant JACKSON. DO McClain, as an additional point, indicates the target number *also showed* up on previously Historical cellular towers dumps, which were derived from TFO Kinal for the two robberies, which occurred on December 29, 2018, at Walgreens in Southfield and Royal Oak, Michigan.

b) The initial goal of TFO Kinal was to conduct a Tower Dump search, in an attempt to identify a possible suspect phone number, who may have utilized a certain cellular tower at a certain time of one of the armed robberies. Apparently, DO McClain already had a variety of sources, which he believed, included defendant JACKSON.

c) DO McClain affirms "Investigative queries using Thompson Reuters CP CLEAR[1] (CLEAR") revealed that the Target Cellular Device is operated by T-Mobile and registered under the name "Bumps Bumps." McClain learned, from consulting with the Detroit Police Department, that "Bumps Bumps" is a known nickname of JACKSON. CLEAR also show the address of XXX37 Birchcrest, in Detroit, Michigan, as being associated with Target Cellular Device. A query of Michigan Secretary of State show that the Birchcrest address is also listed on JACKSON's Michigan Personal Identification card.

d) DO McClain affirms "According to the Michigan Department of Corrections (MDOC) Offender Tracking Information System (OTIS), JACKSON is currently on parole through

---

[1] Thompson Reuters CP CLEAR is an online investigative tool which queries multiple data sources, including credit headers, motor vehicle records, utilities, real estate and many other data sources.

the State of Michigan for Possession of a Firearm by a Felon and Felony Firearm.

JACKSON was paroled on July 25, 2018 and remains on parole until July 25, 2019. The

number used by the Target Cellular Device is listed as JACKSON's contact number with

MDOC.  The Birchcest address associated with the Target Cellular Device is also listed

as JACKSON's address with MDOC.

e) Lastly, it is important to note that this target number may not have been directly derived

from any valid Tower Dump search warrant obtained by TFO Kinal.


II.    **ARGUMENT**

**WHERE THERE IS INSUFFICIENT FACTS ON THE FACE OF THE
WARRANT TO SUPPORT A FINDING OF PROBABLE CAUSE, OR WHERE
THERE ARE MATERIAL MISREPRESENTATIONS AND OMISSIONS IN
THE AFFIDAIVT USED IN SUPPORT OF THE APPLICATION FOR
SEARCH  WARRANT WHICH, IF DELETED WOULD RESULT IN
INSUFFICIENT PROBABLE CAUSE TO ISSUE THE WARRANT, THE
EVIDENCE SEIZED PURSUANT TO SUCH WARRANT MUST BE
SUPPRESSED AS BEING VIOLATIVE OF THE FOURTH AMENDMENT TO
THE UNITED STATES CONSTITUTION.**

In the Affidavit signed by Detective Paul Kinal, FBI Task Force Officer, the Magistrate

Judge was presented with much irrelevant and misleading and untrue statements, which the

agent knew to be irrelevant, false and misleading. Agent McClain made conclusionary

representations without indicating to the magistrate judge from where the information was

derived.  As a result, the Magistrate Judge imprudently and ill-advisedly signed the warrant

when in fact there was not probable cause to do so. As a result, Defendant's rights under the

Fourth Amendment were violated and any evidence obtained in connection with such seizure

must be suppressed.

### A. Standard for Obtaining a Warrant

An officer seeking a search warrant must produce adequate facts about the circumstances to show that probable cause exists. *U.S. v. Hodson*, 543 F.3d 286, 293-94 (6th Cir. 2008). Probable cause to search a location exists if "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Furthermore, "the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed." *Id*.

*Franks v. Delaware*, 438 U.S. 154 (1978), holds that evidence obtained through a search warrant should be suppressed if the supporting affidavit contains materially false statements or omissions. A defendant is entitled to a *Franks* evidentiary hearing if he makes a "substantial preliminary showing" that (1) a search warrant affidavit contains false statements which were knowingly and intentionally made by the affiant or with a reckless disregard for the truth; and (2) any such alleged false statements are necessary to the finding of probable cause. *Id. at* 156.

However, the circumstances under which an evidentiary hearing ***must*** be held as directed by *Franks* are not the only circumstances under which such a hearing ***may*** be held: a trial court has the discretion to hold a *Franks* evidentiary hearing "in the absence of the substantial preliminary showing." *People v Franklin*, 500 Mich 92; 894 NW2d 561, 572 and 574 (2017) (cited for persuasion). "[T]rial courts possess the authority to grant discretionary evidentiary hearings on the veracity of search warrant affidavits." *Id*. at 571.

If a defendant satisfies these two *Franks* prongs by a preponderance of the evidence during the hearing, a court must examine thereafter whether, with the false material in the

affidavit set aside, the remaining content therein is sufficient to establish probable cause. *Id*. at 156.

If the affidavit is deemed to be insufficient, "the search warrant must be voided and the fruits of the search excluded." *Id*.

The Sixth Circuit has recognized that material omissions - in addition to any false statements - which were made deliberately or in a reckless disregard for the truth may also form the basis of a *Franks* challenge. *United States v. Graham*, 275 F.3d 490, 506 (6th Cir. 2001).

While the standard to obtain a *Franks* hearing for a material omission is higher than a false statement and is only merited in rare cases, the question is whether the omissions cumulatively could be viewed as an intent to mislead. *United States v. Hampton*, 760 F. App'x 399, 404 (6th Cir. 2019)(citing *Mays v. City of Dayton*, 134 F.3d 809, 816 (6th Cir. 1998). When there is a material omission of fact, a *Franks* hearing is warranted if the defendant "makes a strong preliminary showing that the affiant with an intention to mislead excluded critical information from the affidavit, and the omission is critical to the finding of probable cause[.]" *Id*. at 816 (citation omitted).

The Sixth Circuit has reasoned that an assertion is made with a reckless disregard for the truth when, "viewing all the evidence, the affiant . . . entertained serious doubts as to the truth of the statements." *U.S. v. Cican*, 63 Fed. Appx. 832, 837 (6th Cir. 2003). Because - as a subjective state of mind - recklessness must usually be proven circumstantially, a fact finder may infer reckless disregard for the truth from evidence that would give an officer "obvious reasons to doubt the veracity of the allegations" *Id*. (internal quotations omitted); See also, *Peet v. City of Detroit*, 502 F.3d 557, 571 at n. 3 (6th Cir. 2007) (omissions are made with reckless disregard if

the officer withholds facts that any reasonable person would have known is the kind of thing the judge would wish to know).

In this case, both agents made cumulative omissions and misrepresentations as set forth above to cause the magistrate to be misled. TFO Kinal overstated the capabilities of the cell tower "dump" request and was not honest about the deficiencies of the technology. Agent McClain's Affidavit was misleading and false because he asserts that the "target" number was found in the Kinal tower dumps which was not true. The "target number" was revealed from another source that was not shared with the judge.

**The Good Faith Exception to the Exclusionary Rule**.

The good faith exception does not apply to the facts in this case. The good faith exception to the exclusionary rule provides that illegally seized evidence need not be excluded if the officers who executed the warrant acted in reasonable, good faith reliance on its validity. *United States v Leon*, 468 U.S. 897, 919-921; 104 S Ct 3405; 82 L Ed 2d 677 (1984). Whether the police officers acted in good faith is measured by a standard of objective reasonableness. *Leon*, 468 U.S. at 922 (citations omitted).

An officer's reliance on a deficient warrant is not in good faith when "a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Id*. at 922 n 23.

Page 17 of 19

In *Leon*, the Supreme Court listed four circumstances in which the good faith exception does not apply: (1) the magistrate was "misled by information in the affidavit that the affiant either knew or would have known was false" but for his reckless disregard for the truth; (2) "the magistrate wholly abandon[ed] his judicial role;" (3) a police officer relied on an affidavit that was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" or (4) a search warrant is facially deficient such that "the executing officers cannot reasonably presume it to be valid." *Id.* at 923.

In this case, the agent misled the magistrate by…and that was a false impression intentionally made.

Based on those knowingly made omissions, the police relied on an affidavit that was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. Despite the magistrate's signature authorizing the warrant, the agent knew that it lacked sufficient evidence of probable cause, and they knew that it contained material omissions.

WHEREFORE, Defendant moves this Honorable Court to suppress the evidence obtained from these warrants at trial; and he also moves for an evidentiary hearing pursuant to *Franks v Delaware*, 438 U.S. 154; 98 S Ct 2674; 57 L Ed 2d 667 (1978).

Dated: February 1, 2021

Respectfully submitted,

By: /s/*Mark H. Magidson*
   MARK H. MAGIDSON (P25581)
   Attorney for Defendant
   One Park Avenue, Suite 1207
   Detroit, MI 48226
   (313) 963-4311
   mmag100@aol.com

**CERTIFICATE OF SERVICE**

I certify that on  February 1, 2021 I electronically filed the above *Motion* with the Clerk

of the Court using the CM/ECF system, which will send notification of such filing to the parties

of record.


By: /s/Mark H. Magidson
    MARK H. MAGIDSON (P25581)
    Attorney for Defendant

# *Exhibit*

# *A*

AUSA:    Devon Schulz          Telephone: ▮▮▮▮

AO 93 (Rev. 11/13) Search and Seizure Warrant        Task Force Officer:   Paul Kinal          Telephone: ▮▮▮▮

## UNITED STATES DISTRICT COURT

for the
Eastern District of Michigan

<table>
<tr><td>I hereby certify that the foregoing is a certified copy of the original on file in this office.<br><br>Clerk, U.S. District Court<br>Eastern District of Michigan<br><br>By: L. HOSKING<br>    Deputy</td></tr>
</table>

| In the Matter of the Search of | ) | |
|---|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) | Case No.  2:19-mc-50040 |
| | ) | Judge: Hood, Denise Page |
| Multiple Cellular Phone Service Providers (More fully described in Attachment A) | ) | Filed: 01-09-2019 |
| | ) | |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Eastern _____ District of _____ Michigan _____.
*(identify the person or describe the property to be searched and give its location):*

See ATTACHMENT A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized):*

See ATTACHMENT B.

**YOU ARE COMMANDED** to execute this warrant on or before ___January 23, 2019___ *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m.     ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _the presiding United States Magistrate Judge on duty_ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:  January 9, 2019   11:23 am        *(signature)* Mona K. Majzoub
                                                         *Judge's signature*

City and state:   Detroit, Michigan           Hon. Mona K. Majzoub    U. S. Magistrate Judge
                                              *Printed name and title*

JACKSON_00155

## <u>ATTACHMENT A</u>

### Places to be Searched

The records and other information described in Attachment B held

with the following Service Providers:

1. Verizon Wireless, Bedminster, New Jersey

2. AT&T Corporation, North Palm Beach, Florida

3. Sprint Corporation, Overland Park, Kansas

4. MetroPCS, Parsippany, New Jersey

5. T-Mobile US, Inc., Parsippany, New Jersey

-14-

JACKSON_00156

# ATTACHMENT B

## I.    The Cell Tower

This Order applies to certain records and information associated

with the following cellular telephone towers ("cell towers") at the

following dates and times:

| Cell Towers | Dates | Times (EST) |
|---|---|---|
| The cellular towers that provided cellular service to 13550 W. Nine Mile Road, Oak Park, Michigan | November 25, 2018 | 10:00 p.m. to 11:15 p.m. |
| The cellular towers that provided cellular service to 8706 N. Telegraph Rd, Dearborn Heights, Michigan | December 5, 2018 | 7:30 p.m. to 8:45 p.m. |
| The cellular towers that provided cellular service to 23111 Lahser Rd., Southfield, Michigan | December 29, 2018 | 9:15 p.m. to 10:25 p.m. |
| The cellular towers that provided cellular service to 30852 Woodward Ave, Royal Oak, Michigan | December 29, 2018 | 10:30 p.m. to 11:15 p.m |

JACKSON_00157

## II.   Records and Other Information to be Disclosed

For each cell tower described in Part I of this Attachment, the Service Providers named in the Order are required to disclose to the United States all records and other information (not including the contents of communications) about all communications made using the cell tower during the corresponding timeframe(s) listed in Part I, including the records that identify:

1.   The telephone call number and unique identifiers for each wireless device in the vicinity of the tower ("the locally served wireless device") that registered with the tower, including Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), and International Mobile Equipment Identities ("IMEI");

2.   The source and destination telephone numbers associated with each communication (including the number of the locally served wireless device and the number of the telephone that called, or was called by, the locally served wireless device);

-16-

3.      The date, time, and duration of each communication;

4.      The "sectors" (i.e. the faces of the towers) that received a radio signal from each locally served wireless device;

5.      The type of communication transmitted through the tower (such as phone call or text message).

These records should include records about communications that were initiated before or terminated after the specified time period, as long as part of the communication occurred during the relevant time period identified in Part I.

-17-

JACKSON_00159

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

In Re: SEALED MATTER

_____/

Misc. No.    2:19-mc-50040
Hon.        Judge: Hood, Denise Page
Filed: 01-09-2019

## MOTION AND ORDER TO SEAL SEARCH WARRANT

THE UNITED STATES OF AMERICA respectfully requests that the

documents filed consisting of a Search Warrant, application for a Search Warrant,

and accompanying affidavit, be sealed to avoid compromising an ongoing

investigation.

WHEREFORE, the government respectfully requests that the Search

Warrant, application for a Search Warrant, and affidavit in this cause be sealed until

further order of the court.

MATTHEW SCHNEIDER
United States Attorney

*s/Devon E. Schulz*
Devon E. Schulz
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
████████████

Dated: January 9, 2019

**IT IS SO ORDERED.**

Mona K. Majzoub
United States Magistrate Judge

Entered:    January 9, 2019

AUSA: Devon Schulz    Telephone:

AO 106 (Rev. 04/10) Application for a Search Warrant   Task Force Officer: Paul Kinal    Telephone:

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Michigan

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
               Case No.
Multiple Cellular Phone Service Providers )
(More fully described in Attachment A) )

Case No.   2:19-mc-50040
Judge: Hood, Denise Page
Filed: 01-09-2019

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See ATTACHMENT A.

located in the ____Eastern____ District of ____Michigan____ , there is now concealed *(identify the person or describe the property to be seized)*:

See ATTACHMENT B.

> I hereby certify that the foregoing is a certified copy of the original on file in this office.
>
> **Clerk, U.S. District Court**
> **Eastern District of Michigan**
>
> By: L. HOSKING
>      Deputy

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- [x] evidence of a crime;
- [ ] contraband, fruits of crime, or other items illegally possessed;
- [ ] property designed for use, intended for use, or used in committing a crime;
- [ ] a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. 1951 | Hobbs Act armed robberies |

The application is based on these facts:

See attached AFFIDAVIT.

- [x] Continued on the attached sheet.
- [ ] Delayed notice _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Detective Paul Kinal, Task Force Officer (FBI)
*Printed name and title*

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date:    January 9, 2019

City and state:   Detroit, Michigan

*Judge's signature*

Hon. Mona K. Majzoub    U. S. Magistrate Judge
*Printed name and title*

JACKSON_00161

## AFFIDAVIT FOR A SEARCH WARRANT

I, FBI Task Force Officer Paul Kinal, do swear and affirm the following:

### I.   INTRODUCTION

1.    I am a detective with the Southfield Police Department assigned to the Oakland County Gang and Violent Crime Task Force ("Task Force"). I have been a Southfield Police officer since December of 2000 and involved with the Task Force since May of 2016. During my career in law enforcement, I have been involved in numerous criminal investigations, including firearms violations, assaults, homicides, robberies, and narcotics investigations.

2.    This affidavit is based on my training and experience, a review of reports prepared by law enforcement officers/agents, and investigative work conducted by myself and other members of the Task Force. This affidavit contains information for establishing probable cause and does not include all facts known to law enforcement related to this investigation.

3.    The Task Force is investigating a series of four armed robberies that took place in Oakland and Wayne Counties in violation of 18 U.S.C. § 1951.

## II.    SUMMARY OF THE INVESTIGATION

4.    All four armed robberies being investigated by the Task

Force occurred at Walgreens Pharmacies ("Walgreens"). Throughout my

investigation, I learned that the safe for each of these Walgreens is

located in or near the store manager's office. The store manager's office

is not in the main area of the Walgreens and it is not accessible to the

general public. The area in which the store manager's office is located is

only accessible via a keypad. However, the keypad protected area is

accessible via the back of the coolers, the front of which open to the

general public.

5.    On November 25, 2018, at approximately 10:21 p.m., an

unknown black male, approximately 30 years old, approximately 5'8" to

5'11" in height, wearing white/gray tennis shoes, gray sweatpants, a

black hooded sweatshirt, and a black winter hat entered and ultimately

robbed the Walgreens located at 13550 W. Nine Mile Road in Oak Park,

Michigan. Upon entering, the unknown male walked around the

Walgreens until the photo and cooler area was clear of customers. It

appeared at this time that the unknown male was making a phone call

on a cell phone. The unknown male bent down to the bottom shelf of the

-2-

JACKSON_00163

refrigerated cooler, moved items on the shelf, and forced his way into the interior of the cooler. At some point, the unknown male also donned white gloves and pulled a white t-shirt up over his face. Once on the other side of the cooler, the unknown male confronted the manager with a black handgun and forced the manager to enter the manager's office to open the safe. The manager complied and opened the safe. The unknown male ordered the manager to place the cash into a black cloth bag that the unknown male had on his person. The manager complied and handed over approximately $7,975 in U.S. Currency. The unknown male had the manager walk him to the back door, where he then fled the Walgreens on foot.

6.      On December 5, 2018, at approximately 7:47 p.m., an unknown black male, approximately 20-30 years old, approximately 5'9" to 6'0" in height, wearing white/grey shoes, gray pants, a black hooded sweatshirt, and a black winter hat, entered and ultimately robbed the Walgreens located at 8706 N Telegraph Rd. in Dearborn Heights, Michigan. The unknown male was observed on surveillance video walking around the interior perimeter of the Walgreens. The unknown male was next observed on surveillance video in the keypad-restricted

-3-

JACKSON_00164

area near the manager's office. The unknown male lingered in the area near the office, occasionally entering an adjacent electrical room. The unknown male had his hood over his head, had a white mask covering his face, and was wearing black gloves. The unknown male was also armed in his left hand with a black handgun with an extended magazine. When the manager appeared, the unknown male confronted the manager, pointed the gun at them, and forced them to open the safe in the manager's office. The manager complied and opened the safe. The unknown male then ordered the manager to place the cash into a black cloth bag that the unknown male had on his person. The manager complied and handed over approximately $4,000 in U.S. Currency. During this time, a fellow employee entered the office area. The unknown male pointed the gun at the employee and ordered them not to move. The employee complied. The unknown male eventually forced the manager and the employee into the electrical closet and fled the store.

7.     On December 29, 2018, at approximately 9:40 p.m., an unknown black male, approximately 20 years old, approximately 5'9" to 5'11" in height, wearing white/grey shoes, gray pants, a black hooded

-4-

sweatshirt, and a black winter hat, entered and attempted to rob the Walgreens located at 23111 Lahser Rd., in Southfield, Michigan. The unknown male walked to the rear of the store and began to pace while watching employees restock shelves. Eventually, the unknown male pushed items through the shelf in the cooler and forced his way into the interior of the cooler. The interior of the cooler allowed access to the manager's office area. The unknown male had his hood over his head, had a white t-shirt covering his face, and was wearing black gloves. The unknown male was also armed with a black handgun with an extended magazine in his left hand. The unknown male approached an employee and demanded that the employee open the safe. The employee advised that they did not have access to anything. The unknown male ordered the employee to call for the manager. The manager realized something was wrong and fled the store. The unknown male escorted the employee around the store to look for the manager. While escorting the employee, the unknown male held on to the employee's right arm and had the gun pressed against the employee's back. The employee was able to escape when the unknown male asked them to check to see if the front entrance door was locked. The unknown male then left the

-5-

JACKSON_00166

Walgreens and followed a different employee who took refuge in a neighboring business. The unknown male followed after that employee while armed with the handgun in his left hand. Once that employee entered the neighboring business, the unknown male fled west on foot between the buildings to an adjacent parking lot, when he entered an unknown vehicle.

8.    On December 29, 2018, at approximately 10:41 p.m., an unknown black male, approximately 5'9" to 6'0" in height, wearing white/grey shoes, gray pants, a black hooded sweatshirt, and a black winter hat, entered and ultimately robbed the Walgreens located at 30852 Woodward Ave, Royal Oak, Michigan. The location of this Walgreens is important because your Affiant knows, based on his familiarity with the area, that it is approximately twenty minutes away from the Walgreens in Southfield that was the site of the attempted armed robbery only an hour prior. Once inside of this Walgreens, the unknown male immediately walked to the cooler, waited for employees to leave the area, pushed back several cases of beer within the cooler, and crawled through the opening into the interior of the cooler. The unknown male then entered the manager's office. The unknown male

-6-

was initially observed on surveillance with his face uncovered, but he then removed his winter hat, donned a white t-shirt over his face and one glove over his left hand, and put the winter hat back on his head. The unknown male was armed with a black handgun with an extended magazine. The unknown male confronted an employee who entered the office area and ordered them to call the manager. The employee complied and called for the manager via the in-store PA system. The manager arrived to the office and was confronted by the unknown male who pointed the gun at them and ordered them to open the safe. The manager complied and handed over approximately $3,500 U.S. Currency. The unknown male fled the store on foot. Responding Royal Oak Police Officers were able to track footprints in the snow to a nearby alley, where they observed a black cotton winter glove near a set of tire tracks. The glove appeared to be recently dropped in the area.

9.    Affiant has had an opportunity to review the evidence, including images and videos, related to these armed robberies. In all four incidents, the unknown male was observed to be a black male, approximately the same height and weight, approximately the same age, wearing the same clothing, displaying a black semi-automatic

-7-

JACKSON_00168

handgun with an extended magazine, and covering his face with a white t-shirt or mask to effectuate the robbery. In three of the incidents, the unknown male was observed using the cooler inside of the Walgreens to gain access to the keypad-restricted area and was observed in the keypad-restricted area in all four of the incidents. All four incidents occurred between 7:45 p.m. and 11:00 p.m. Based on Affiant's training and experience, these facts establish probable cause to believe that the same unknown male is the suspect who committed the three armed robberies and the one attempted armed robbery described above.

10.  Video stills of the incident show that the unknown male was accessing what appeared to be a cell phone during the first armed robbery in Oak Park on November 25, 2018. Based on Affiant's training and experience, individuals carry their cell phones on their person day and night.[1] Because the unknown male was seen using a cell phone during the November 25 robbery, it is highly likely that the unknown male had possession of and/or used his cell phone during the subsequent three robberies. Furthermore, because there is probable

---

[1] In *Riley v. California*, 134 S. Ct. 2473, 2490 (2014), the Supreme Court cited one poll which found that "nearly three-quarters of smart phone users report being within five feet of their phones most of the time, with 12% admitting that they even use their phones in the shower."

-8-

cause to believe that the unknown male in all four robberies is the same individual, there is probable cause to believe that the unknown male had possession of and/or used the same cell phone during all four robberies.

### III. CELL TOWERS

11.    Many cellular service providers maintain antenna towers ("cell towers") that serve specific geographic areas. Each cell tower receives signals from wireless devices, such as cellular phones, in its general vicinity. These cell towers allow the wireless devices to transmit or receive communications, such as phone calls, text messages, and other data. The tower closest to a wireless device does not necessarily serve every call made to or from that device.

12.    In addition to a unique telephone number, each cell phone is identified by one or more unique identifiers. Depending on the cellular network and the device, the unique identifiers for a cell phone could include an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile

-9-

JACKSON_00170

Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI").

13.    Cellular service providers routinely maintain historical cell-tower log information, including records identifying the wireless telephone calls and communications that used a particular tower. For each communication, these records may include the telephone call number and unique identifiers for the wireless device in the vicinity of the tower that made or received the communication ("the locally served wireless device"); the source and destination telephone numbers associated with the communication (including the number of the telephone that called or was called by the locally served wireless device); the date, time, and duration of the communication; the "sectors" (i.e., the faces of the towers) that received a radio signal from the locally served device; and the type of communication transmitted through the tower (such as phone call or text message).

14.    Based on the above facts, there is reason to believe that the records described in Attachment B would identify which wireless devices were communicating with towers providing cellular service to the vicinity of :

-10-

a. 13550 W. Nine Mile Rd, Oak Park, Michigan, on November 25, 2018, from 10:00 p.m. to 11:15 p.m.;

b. 8706 N. Telegraph Rd, Dearborn Heights, Michigan, on December 5, 2018, between 7:30 p.m. to 8:45 p.m.;

c. 23111 Lahser Rd, Southfield, Michigan, on December 29, 2018, from 9:15 p.m.to 10:30 p.m.; and

d. 30852 Woodward Ave, Royal Oak, Michigan, on December 29, 2018, from 10:30 p.m. to 11:15 p.m.

## IV. CONCLUSION

15. Probable cause exists to believe that the records and other information described in Attachment B contain evidence related to identifying the unknown individual who violated 18 U.S.C. § 1951 by committing multiple Hobbs Act armed robberies within the Eastern District of Michigan.

16. This warrant requests that the Court direct the Service Providers, Verizon Wireless, At&T Corporation, Sprint Corporation, MetroPCS, and T-Mobile US, Inc., to produce all items described in Part II of Attachment B.

-11-

17.     Data pertaining to third parties with no connection to the matter under investigation may be acquired as a result of this search warrant. Absent further order of the court, the government will not make investigative use of this data, other than using it to distinguish data from devices used by the subjects of the investigation from all other devices. After the government identifies devices used by the subjects of the investigation, the government will retain third party data during the pendency of any criminal proceedings because it may be used by the defense as favorable evidence. At the completion of any criminal proceedings, this third party data will be discarded.

18.     The United States may use a search warrant issued under the Federal Rules of Criminal Procedure and Rule 18 U.S.C. § 2703(c) to require a provider of electronic communication service to disclose records or other information pertaining to a subscriber or customer of such service, not including the contents of any communications.

19.     Cellular service providers are providers of an electronic communications service, as defined in 18 U.S.C. §2510(15). Accordingly, the United States may use a search warrant issued under the Federal Rules of Evidence and 18 U.S.C. § 2703(c) to require the Service

-12-

Providers to disclose the items described in Part II of Attachment B, excluding the contents of any communications, which are "record[s] or other information pertaining to a subscriber to or customer of such service." 18 U.S.C. § 2703(c)(1).

20.    A search warrant may not be legally necessary to authorize all of the investigative techniques described. Nevertheless, I submit this warrant application out of an abundance of caution.

Dated:

_____
Detective Paul Kinal
FBI Task Force Officer

Sworn to before me and signed in my
presence and/or by reliable electronic means.

_____   January 9, 2019
MONA K. MAJZOUB
UNITED STATES MAGISTRATE JUDGE

-13-

*Exhibit*

*B*

AO 106 (Rev. 04/10) Application for a Search Warrant     Task Force Officer:     Christopher McClain     Telephone:

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Michigan

| | |
|---|---|
| In the Matter of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>The cellular device assigned call number ███ -1482 | )<br>)<br>)     Case No.  19-50040-3<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following property *(describe the property to be searched and give its location):*

See ATTACHMENT A.

located in the _____Eastern_____ District of _____Michigan_____ , there is now concealed *(describe the property to be seized):*

See ATTACHMENT B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1951 | Hobbs Act |

See Affidavit. To ensure compliance with the Pen Register Statute, this Search Warrant Application sets forth requirements in 18 U.S.C. § 3122 and the Search Warrant acts as a Pen Register order under 18 U.S.C. § 3123. Accordingly, the undersigned attorney certifies: (i) he / she is an "attorney for the government," (ii) __FBI__ is the law enforcement agency conducting the investigation, and (iii) the information sought is likely to be relevant to an ongoing investigation of this agency.

☑ Continued on the attached sheet.

☑ Delayed notice __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____     _____
*Search Warrant Applicant's signature*          *Pen Register Applicant's signature*

Christopher McClain, Task Force Officer (FBI)     Devon E. Schulz, Assistant United States Attorney
*Agent's printed name and title*          *AUSA printed name and title*

Search warrant sworn to before me and signed in my presence and/or by reliable electronic means.

Date:     April 24, 2019          _____
*Judge's signature*

City and state:  Detroit, Michigan          Hon. R. Steven Whalen     U. S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE CELLULAR DEVICE ASSIGNED CALL NUMBER ▮▮▮▮▮▮1482 | Case No. 19-50040-3 <br><br> **Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

    I, Christopher McClain, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND BACKGROUND

    1.    I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 to authorize law enforcement to employ electronic investigative techniques, as described in the following attachment, to determine the location of the cellular device assigned dialed number ▮▮▮▮▮▮1482, referred to in this affidavit as the "Target Cellular Device." The service provider for the Target Cellular Device is T-Mobile. This affidavit is made in support of up to two different search warrants to locate the phone: 1) by obtaining information from the service provider, e.g., cell site information, and/or 2) by utilizing a device that acts as a cell phone tower, sometimes referred to as a Cell Site Simulator. In addition, because this request may be construed as a Pen

1

Register / Trap and Trace device or request, the application for this warrant (which includes this affidavit) is intended to comply with 18 U.S.C. § 3122.

2.      Your affiant is employed as a Deportation Officer (DO), with United States Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE). I am currently assigned as a Task Force Officer (TFO) to the FBI Oakland County Gang and Violent Crime Task Force (OCGVCTF). I have experience in the investigation, apprehension and prosecution of individuals involved in federal criminal offenses, the use of cellular devices to commit those offenses, and the available technology that can be used by law enforcement to assist in identifying the users of cellular devices and their location.

3.      In January of 2019, the FBI Oakland County Gang and Violent Crime Task Force (OCGVCTF) began investigating a series of similar armed robberies of Walgreens stores in the Metro Detroit area; including in Oak Park, Dearborn Heights, Southfield, Royal Oak, and Warren. These robberies occurred over a span of approximately 5 months, with the first occurring in late November and the most recent occurring in late March. All 5 robberies involve the same method of operation, and MARIO KEEREAM JACKSON is believed to have committed all 5 robberies, as described more fully below.

4.      There is reason to believe the Target Cellular Device is currently located in the Eastern District of Michigan and is being used locally because

2

JACKSON—the user of the Target Cellular Device—is currently on parole with the State of Michigan in this district, the number is associated with JACKSON (as described below), and the Target Cellular Device is associated with an address in and has an area code associated with Detroit, Michigan. Historical cellular tower dumps, obtained from a previous search warrant, also show that the Target Cellular Device used cellular towers that service the area of the two armed robberies that took place on December 29, 2018, at Walgreens in Southfield and Royal Oak, Michigan.

*No on phone – only OP & 2 more*

5.      Based on the facts set forth in this affidavit, there is probable cause to believe that JACKSON is using the Target Cellular Device. There is also probable cause to believe that JACKSON is the suspect who has committed a string of armed robberies of various Walgreens in the last 5 months in the Eastern District of Michigan. I know from training and experience that cell phone users normally have their cell telephones with them, so locating a user's cell phone will show that user's location. Therefore, I believe that locating the Target Cellular Device will lead to evidence of federal offenses, namely Hobbs Act Robbery, in violation of 18 U.S.C. § 1951, committed by JACKSON. Pursuant to Rule 41(b)(2), law enforcement may locate the Target Cellular Device outside the district provided the device is within the district when the warrant is issued.

3

JACKSON_00262

6.      The facts in this affidavit come from my personal observations, training, and experience, and from information obtained from other agents, members of law enforcement, and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

### A.      *The Five Armed Robberies*

7.      Robbery One took place on November 25, 2018 in Oak Park, Michigan. At approximately 10:21 p.m., an unknown black male, approximately 30 years old, approximately 5'8" to 5'11" in height, wearing white/gray tennis shoes, gray sweatpants, a black hooded sweatshirt, and a black winter hat entered and ultimately robbed the Walgreens located at 13550 W. Nine Mile Road, in Oak Park, Michigan. A review of police reports and surveillance video revealed the following:

a. The unknown male bent down to the bottom shelf of the refrigerated cooler, moved items on the shelf, and forced his way into the interior of the cooler. At some point, the unknown male also donned white gloves and pulled a white t-shirt up over his face.

b. Once on the other side of the cooler, the unknown male confronted the

4

manager with a black handgun and forced the manager to enter the

manager's office to open the safe. The manager complied and opened

the safe. The unknown male ordered the manager to place the cash

into a black cloth bag that the unknown male had on his person. The

manager complied and handed over approximately $7,975 in U.S.

Currency. The unknown male had the manager walk him to the back

door, where he then fled the Walgreens on foot. The manager later

discovered that the suspect had deactivated store's camera system and

computers by pulling the cords out of out of the wall.

8.      Robbery Two took place on December 05, 2018, in Dearborn Heights,

Michigan. An unknown black male, approximately 20-30 years old, approximately

5'9" to 6'0" in height, wearing white/grey shoes, gray pants, a black hooded

sweatshirt, and a black winter hat, entered and ultimately robbed the Walgreens

located at 8706 N Telegraph Rd. in Dearborn Heights, Michigan. A review of

police reports and surveillance video revealed the following:

    a.   The unknown male was observed on surveillance video walking

         around the interior perimeter of the Walgreens. The unknown male

         was next observed on surveillance video in the keypad-restricted area

         near the manager's office. The unknown male lingered in the area

         near the office, occasionally entering an adjacent electrical room. The

5

unknown male had his hood over his head, had a white mask covering his face, and was wearing black gloves. The unknown male was also armed in his left hand with a black handgun with an extended magazine.

b. When the manager appeared, the unknown male confronted the manager, pointed the gun at them, and forced them to open the safe in the manager's office. The manager complied and opened the safe. The unknown male then ordered the manager to place the cash into a black cloth bag that the unknown male had on his person. The manager complied and handed over approximately $4,000 in U.S. Currency. During this time, a fellow employee entered the office area. The unknown male pointed the gun at the employee and ordered them not to move. The employee complied. The unknown male eventually forced the manager and the employee into the electrical closet and fled the store.

9.    Robbery Three took place on December 29, 2018, in Southfield, Michigan. At approximately 9:40 p.m., an unknown black male, approximately 20 years old, approximately 5'9" to 5'11" in height, wearing white/grey shoes, gray pants, a black hooded sweatshirt, and a black winter hat, entered and attempted to rob the Walgreens located at 23111 Lahser Rd., in Southfield, Michigan. A review

6

of police reports and surveillance video revealed the following:

a. The unknown male walked to the rear of the store and began to pace while watching employees restock shelves. Eventually, the unknown male pushed items through the shelf in the cooler and forced his way into the interior of the cooler. The interior of the cooler allowed access to the manager's office area. The unknown male had his hood over his head, had a white t-shirt covering his face, and was wearing black gloves. The unknown male was also armed with a black handgun with an extended magazine in his left hand.

b. The unknown male approached an employee who had entered the keypad-restricted area and demanded that the employee open the safe. The employee advised that they did not have access to anything. The unknown male ordered the employee to call for the manager. The manager realized something was wrong and fled the store. The unknown male escorted the employee around the store to look for the manager.

c. While escorting the employee, the unknown male held on to the employee's right arm. The employee was able to escape when the unknown male asked them to check to see if the front entrance door was locked. The unknown male then left the Walgreens and followed

7

JACKSON_00266

a different employee who took refuge in a neighboring business. The unknown male followed that employee while armed with the handgun in his left hand. Once that employee entered the neighboring business, the unknown male fled west on foot between the buildings to an adjacent parking lot.

10.  Robbery Four took place on December 29, 2018, in Royal Oak, Michigan. At approximately 10:41 p.m., an unknown black male, approximately 5'9" to 6'0" in height, wearing white/grey shoes, gray pants, a black hooded sweatshirt, and a black winter hat, entered and ultimately robbed the Walgreens located at 30852 Woodward Ave, in Royal Oak, Michigan. A review of police reports and surveillance video revealed the following:

    a.  The location of this Walgreens is important because your Affiant knows, based on his familiarity with the area, that it is approximately twenty minutes away from the Walgreens in Southfield (Robbery Three) that was the site of the attempted armed robbery only an hour prior.

    b.  Once inside of this Walgreens, the unknown male immediately walked to the cooler, waited for employees to leave the area, pushed back several cases of beer within the cooler, and crawled through the opening into the interior of the cooler. The unknown male then

8

entered the manager's office. The unknown male was initially
observed on surveillance with his face uncovered, but he then
removed his winter hat, donned a white t-shirt over his face and one
glove over his left hand, and put the winter hat back on his head. The
unknown male was armed with a black handgun with an extended
magazine.

c. The unknown male confronted an employee who entered the office
area and said, "you know what this is" and "I will not hurt you" and
ordered the employee to call the manager. The employee complied
and called for the manager via the in-store PA system. The unknown
male and employee waited 15 minutes until the manager arrived to the
office, where he was confronted by the unknown male armed with a
gun. The unknown male said "you know what time it is." The
manager opened the safe and handed over approximately \$3,500 in
U.S. Currency. The unknown male fled the store on foot.

d. Responding Royal Oak Police Officers were able to track the
suspect's footprints in the snow to a nearby alley where they observed
a black cotton winter glove near a set of tire tracks. The glove
appeared to be recently dropped in the area. The glove was
subsequently sent to the Oakland County Crime Lab for DNA testing

9

JACKSON_00268

where it was determined that a female was the main contributor of the

DNA along with two other unknown male contributors.

11. Robbery Five took place on March 28, 2019, in Warren, Michigan. At

approximately 8:33 p.m., an unknown black male, approximately 6'0" in height,

approximately 20-25 years of age, wearing a black hat, black zip-up hooded

sweatshirt, black sweatpants, black socks, and black shoes entered the Walgreens

located at 22950 Van Dyke Ave., in Warren, Michigan. A review of police reports

and surveillance video revealed the following:

      a. Upon entry into the Walgreens, the unknown male was observed

         carrying a cell phone in his left hand. He walked to the cooler area,

         pushed back items on the shelf, and crawled through the opening into

         the interior of the cooler. The unknown male emerged in the

         employee hallway and approached the closed manager's office door.

         He ordered the manager to open the door at gun point. The manager

         raised his hands in the air and complied. The unknown male, who had

         a white fabric covering his face, white latex gloves on his hands, and a

         black semi-automatic handgun with an extended magazine in his left

         hand, ordered the manager to place cash from the safe into a clear

         plastic garbage bag recovered from a nearby trash can. The unknown

         male then ordered the manager to disable the video surveillance

10

system.  The manager complied and unplugged the system.  The
unknown male asked when the pharmacy closed and the manager
replied, "9:00 p.m."

b. The unknown male then ordered the manager out of the office with
the gun pressed against his back.  He had the manager walk him
towards the pharmacy.  The unknown male entered the pharmacy and
demanded narcotics, using slang terms such as "blues" and "lean,"
and specifically "Percocets."  The unknown male ordered the
pharmacist to open the safe containing the narcotics.  Once open, the
unknown male forced the pharmacist to place numerous bottles of
oxycodone and hydrocodone into a Walgreens bag.  The unknown
male ordered the manager to walk him out of the store.  The manager
walked him to an emergency exit where he fled the building on foot.
Approximately $4,730 in U.S. Currency and 5,297 oxycodone and
hydrocodone pills were stolen.

12.     Affiant has had an opportunity to review the evidence, including
images and videos, related to these incidents. In all five incidents, the unknown
male was observed to be a black male, approximately the same height and weight,
approximately the same age, wearing similar clothing, displaying a black semi-
automatic handgun with an extended magazine, and covering his face with a t-shirt

11

or mask to effectuate the robbery. In four of the incidents, the unknown male was observed using the cooler inside of the Walgreens to gain access to the keypad-restricted area and was observed in the keypad-restricted area in all five of the incidents. All five incidents occurred between 7:45 p.m. and 11:00 p.m.  Based on Affiant's training and experience, these facts establish probable cause to believe that the same unknown male is the suspect who committed the four armed robberies and the one attempted armed robbery described above.

13.    Video stills from the incidents show that the unknown male was holding what appeared to be a cell phone during the first armed robbery in Oak Park on November 25, 2018, and during the robbery in Warren on March 28, 2019. Based on Affiant's training and experience, individuals carry their cell phones on their person day and night.[1]  Because the unknown male was seen holding a cell phone during both the November 25, 2018 robbery and the March 28, 2019 robbery, it is highly likely that the unknown male used his cell phone during the other three incidents. Furthermore, because there is probable cause to believe that the unknown male in all five incidents is the same individual, there is probable cause to believe that the unknown male had possession of and/or used the same

---

[1] In *Riley v. California*, 134 S. Ct. 2473, 2490 (2014), the Supreme Court cited one poll which found that "nearly three-quarters of smart phone users report being within five feet of their phones most of the time, with 12% admitting that they even use their phones in the shower."

JACKSON_00271

cell phone during all five incidents.

### B.       *Identification of Mario Keeream Jackson*

14.     On January 09, 2019, the Honorable Magistrate Judge Mona K. Majzoub authorized a federal search warrant (2:19-mc-50040) for information from multiple cellular phone service providers (i.e. tower dumps, which are historical collections of all cellular traffic that utilized a specific cellular tower at a specific time).

15.     Affiant and other law enforcement agents have reviewed the records received from multiple cellular phone providers and learned that on December 29, 2018, at 10:07 p.m., the Target Cellular Device used a cellular tower which services the area covering the Southfield Walgreens robbery location. The Southfield robbery occurred between 9:40 p.m. and 10:08 p.m.  On the same date, at 10:46 p.m., the Target Cellular Device used a cellular tower which services the area covering the Royal Oak Walgreens robbery location. The Royal Oak robbery occurred between 10:41 p.m. and 11:07 p.m.

2 locations
No phone
visible



13

17.    Investigative queries using Thompson Reuters CP CLEAR[2] (Clear)

revealed that the Target Cellular Device is operated by T-Mobile and registered

under the name "Bumps Bumps." You Affiant learned, from consulting with the

Detroit Police Department, that "Bumps Bumps" is a known nickname of

JACKSON's. Clear also shows the address of XXX37 Birchcrest, in Detroit,

Michigan, as being associated with the Target Cellular Device. A query of

Michigan Secretary of State shows that the Birchcrest address is also listed on

JACKSON's Michigan Personal Identification card.

18.    According to the Michigan Department of Corrections (MDOC)

Offender Tracking Information System (OTIS), JACKSON is currently on parole

through the State of Michigan for Possession of a Firearm by Felon and Felony

Firearm. JACKSON was paroled on July 25, 2018 and remains on parole until July

25, 2019. The number used by the Target Cellular Device is listed as JACKSON's

contact number with MDOC. The Birchcrest address associated with the Target

Cellular Device is also listed as JACKSON's address with MDOC.

---

[2] Thompson Reuters CP CLEAR is an online investigation tool which queries multiple data sources, include credit headers, motor vehicle records, utilities, real estate, and many other data sources.

14

19.     The physical description of JACKSON on both his Michigan Personal Identification card (B/M, 6'0 in height, approximately 145 lbs.) and on OTIS (B/M, 5'11 in height, approximately 160 lbs.) matches the physical description of the suspect who committed the above described armed robberies. JACKSON's DOB is 5/XX/1988, making him approximately 30 years old.

20.     A query of the Law Enforcement Information Network (LEIN) and National Law Enforcement Telecommunications System (NLETS) revealed JACKSON to have the following convictions:

a. October 11, 2005: convicted of Assaulting/Obstructing a Police Office and Possession of Marijuana, sentenced to 365 days jail and probation, 37th District Court, Warren, Michigan.

b. April 6, 2010: convicted of Retail Fraud 1st Degree, sentenced to 183 days jail, 6th Circuit Court, Pontiac, Michigan.

c. February 15, 2011: convicted of Retail Fraud 2nd Degree, sentence unknown, 41A District Court, Shelby Township, Michigan.

d. March 21, 2011: convicted of False Report of Misdemeanor, sentenced to 5 days jail, 39th District Court, Roseville, Michigan.

e. May 07, 2012: convicted of Carrying Concealed Weapon, and Controlled Substance Possession, sentenced to 2-20 years prison, 3rd Circuit Court, Detroit, Michigan.

15

JACKSON_00274

    f.  February 23, 2015: convicted of Felony Firearm, Possession of

        Firearm by Felony, sentenced to 2-10 years prison, 3rd Circuit Court,

        Detroit, Michigan.

21.    A query of LEIN revealed JACKSON to have the following

outstanding warrants:

    a.  2010: Disorderly Conduct out of Highland Park, Michigan.

    b.  2010: Disorderly Conduct out of Highland Park, Michigan.

    c.  2013: Retail Fraud out of Shelby Township, Michigan.

    d.  2014 to 2016: 9 traffic warrants out of Detroit Michigan..

## AUTHORIZATION REQUEST & MANNER OF EXECUTION

22.    There is probable cause to believe that the same individual committed

all five of the armed robberies of Walgreens described above. There is also

probable cause to believe that individual possessed the Target Cellular Device and

that the Target Cellular Device belongs to JACKSON. Therefore, I believe that

locating the Target Cellular Device will lead to evidence of violations of Federal

law, namely, Hobbs Act Robbery, in violation of 18 U.S.C. § 1951. Specifically,

knowing JACKSON's location would assist the FBI and OCGVTF in surveillance

operations by revealing where JACKSON lives and when/if he may attempt to rob

another Walgreens. Information obtained from this search warrant will be used to

attempt to locate JACKSON within the next 30 days and further this investigation.

16

23.     Based on the above information, I request that the Court issue the proposed search warrant pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

24.     Because collecting the information authorized by this warrant may fall within the statutory definitions of a "pen register" or a "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), this application and the accompanying warrant are intended to comply with requirements set forth in 18 U.S.C. §§ 3122-3123.

25.     In my training and experience, I have learned that cellular phones and other cellular devices communicate wirelessly across a network of cellular infrastructure, including towers that route and connect individual communications. When sending or receiving a communication, a cellular device broadcasts certain signals to the cellular tower that is routing its communication. These signals include a cellular device's unique identifiers.

26.     In my training and experience, I have learned that T-Mobile is a company with its headquarters located within the United States that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as

17

"tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.

27.    To facilitate execution of this warrant, law enforcement may use an investigative device or devices (sometimes referred to as a Cell Site Simulator or Wi-Fi geolocation device) capable of broadcasting signals that will be received by the Target Cellular Device or receiving signals from nearby cellular devices, including the Target Cellular Device. Such a device may function in some respects like a cellular tower, except that it will not be connected to the cellular network and cannot be used by a cell phone to communicate with others. The device may send a signal to the Target Cellular Device and thereby prompt it to send signals that include the unique identifier of the device. Law enforcement may monitor the signals broadcast by the Target Cellular Device and use that information to

18

determine the Target Cellular Device's location, even if it is located inside of a house, apartment, or other building.

28.     The investigative device may interrupt cellular service of phones or other cellular devices within its immediate vicinity. Any service disruption to non-target devices will be brief and temporary, and all operations will attempt to limit the interference with such devices. In order to connect with the Target Cellular Device, the device may briefly exchange signals with all phones or other cellular devices in its vicinity. These signals may include cell phone identifiers. The device will not complete a connection with cellular devices determined not to be the Target Cellular Device, and law enforcement will limit collection of information from devices other than the Target Cellular Device. To the extent that any information from a cellular device other than the Target Cellular Device is collected by the law enforcement device, law enforcement will delete that information, and law enforcement will make no investigative use of it absent further order of the court, other than distinguishing the Target Cellular Device from all other cellular devices.

29.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. This delay is justified because there is reasonable cause to

19

believe that providing immediate notification of the warrant may have an adverse result as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the target cellular device would seriously jeopardize the ongoing investigation. Such disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). There is a reasonable necessity for the use of the techniques described. *See* 18 U.S.C. § 3103a(b)(2). As further specified in the attachment, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is a reasonable necessity for that seizure. *See* 18 U.S.C. § 3103a(b)(2).

30.    I further request the following information from the service provider: all precision real-time location information, including E-911 Phase II data, GPS data, and latitude-longitude data, and real time cell site information; call detail records, messaging records, including cell site location since September 09, 2018; subscriber information and extended subscriber information; handset information; and per call measurement data (PCMD), timing advanced/true call, range to tower data (RTT), and Network Event Location System (NELOS) since September 09,

JACKSON_00279

2018 to present.



31.    I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cellular Device outside of daytime hours.

32.    I further request that the Court order all documents in support of this application, including the affidavit and search warrant, be sealed until further order by the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize the investigation. I further request that the Court order any service provider, or their representatives, not to disclose the existence of this warrant or investigation unless ordered to do so by the Court.

21

JACKSON_00280

33.    A search warrant may not be legally necessary to authorize all of the investigative techniques described. Nevertheless, I submit this warrant application out of an abundance of caution.

Respectfully submitted,

Christopher McClain, Task Force Officer
Federal Bureau of Investigation

Sword to before me and signed in my
presence and/or by reliable electronic means.

April 24, 2019

R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

22

JACKSON_00281

# ATTACHMENT A

This warrant authorizes the use of the electronic investigative technique described in Attachment B to identify the location of the cellular device assigned phone number ████████-1482, whose wireless provider is T-Mobile. This warrant also serves as a Pen Register order under 18 U.S.C. § 3123.

The Court makes the following findings: JACKSON is the person to whom the pen register or trap and trace device is to be attached/applied and who is the subject of the criminal investigation; ████████-1482 is the phone number to which the device is to be attached; and Title 18 U.S.C. § 1951, Hobbs Act Robbery, is the offense, or one of the offenses, to which information relates; and

The attorney for the government has certified to this Court that the information likely to be obtained by the installation and use of the pen register or trap and trace device is relevant to an ongoing criminal investigation by the Federal Bureau of Investigation.

1

JACKSON_00282

## ATTACHMENT B

### Particular Things to Be Seized
### with a Cell Site Simulator or Wi-Fi Geolocation Device

This warrant authorizes the officers to whom it is directed to determine the

location of the target cellular device by collecting and examining:

1. radio signals emitted by the target cellular device for the purpose of

   communicating with cellular infrastructure, including towers that route and

   connect individual communications; and

2. radio signals emitted by the target cellular device in response to signals sent

   to it by the officers;

for a period of thirty (30) days, during all times of day and night. This includes

monitoring non-content signaling and routing information, including all non-

content packet switched data, through the installation and use of a pen register and

trap and trace device pursuant to 18 U.S.C. § 3123 by the Federal Bureau of

Investigation. Because the use of the device, a Cell Site Simulator or Wi-Fi

geolocation device, may fall within the definitions of a "pen register" or a "trap

and trace device," see 18 U.S.C. § 3127(3) & (4), the application and the warrant

are designed to comply with the Pen Register Statute as well as Rule 41. The

application therefore includes all information required for and serves as a pen

register application, 18 U.S.C. § 3123(a); similarly, the warrant therefore includes

1

JACKSON_00283

all the information required for and serves as a pen register order, 18 U.S.C. § 3123(b).

This warrant does not authorize the interception of any telephone calls, text messages, or content based internet data. The investigative device may interrupt cellular service of phones or other cellular devices within its immediate vicinity. Any service disruption to non-target devices will be brief and temporary, and all operations will attempt to limit the interference with such devices. In order to connect with the Target Cellular Device, the device may briefly exchange signals with all phones or other cellular devices in its vicinity. These signals may include cell phone identifiers. The device will not complete a connection with cellular devices determined not to be the Target Cellular Device, and law enforcement will limit collection of information from devices other than the Target Cellular Device. To the extent that any information from a cellular device other than the Target Cellular Device is collected by the law enforcement device, law enforcement will delete that information, and law enforcement will make no investigative use of it absent further order of the court, other than distinguishing the Target Cellular Device from all other cellular devices

The Court finds reasonable necessity for use of the techniques and collection of information described. *See* 18 U.S.C. § 3103a(b)(2).

2

JACKSON_00284

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the information described. *See* 18 U.S.C. § 3103a(b)(2).

3