UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff               Case No. 19-cr-20425

v.                                  HON. BERNARD A. FRIEDMAN

MARIO JACKSON,

        Defendant.

**GOVERNMENT'S RESPONSE TO DEFENDANT'S RENEWED MOTION FOR JUDGMENT OF ACQUITTAL OR FOR A NEW TRIAL**

## I. INTRODUCTION

At trial, the government presented overwhelming evidence that convicted felon Mario Jackson robbed four Walgreens, including a DEA registered pharmacy inside one of the Walgreens, and attempted to rob a fifth. And Jackson committed these crimes while brandishing a firearm.

On May 11, 2023, trial commenced against Jackson on 11 counts related to the armed robberies of several Walgreens and attempted armed robbery of one Walgreens that occurred in 2018 and 2019. During the trial, the government called over 20 witnesses and introduced more than 70 exhibits, including security videos, security video screenshots, recorded jail calls, Jackson's cell phone extraction, text messages, cell phone records, and cell phone location data. The parties also entered

several stipulations as exhibits.

After a short deliberation, the jury convicted Jackson of all 11 counts.[1] Jackson now moves for judgment of acquittal under Fed. R. Crim. P. 29 alleging that the government did not present sufficient evidence to the jury that would have sustained a conviction on the 11 counts Jackson was convicted of. The Court should deny Jackson's motion because the government presented sufficient evidence to the jury on the essential elements of the charged offenses.

In the alternative, Jackson moves for a new trial under Fed. R. Crim. P. 33 alleging that the Court erred in allowing Jackson to testify in his jail clothes and restraints. The Court should deny Jackson's motion because it was his own strategic choice to attempt to manipulate the jury by testifying in his jail clothes while restrained.

## II.   JACKSON'S RULE 29 MOTION

### A. Legal Standard

"[A] defendant claiming insufficiency of the evidence bears a heavy burden." *United States v. Palaszewski,* 161 F.3d 992, 1005 (6th Cir.1998). "It is

---

[1] Jackson was originally charged in Count Six with a Section 924(c) offense that was attached to the Attempt-Hobbs Act robbery charged in Count Five. However, after Jackson was charged the Supreme Court held that Attempt-Hobbs Act robbery is not a crime of violence, and therefore cannot be used as a predicate for a charge of using firearm in furtherance of a crime of violence. *United States v. Taylor*, 142 S. Ct. 2015 (2022). As a result, the government moved to dismiss Count Six and it was not presented to the jury.

well settled that the test to be applied by a trial court in determining a defendant's motion for acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure is taking the evidence and inferences most favorably to the government, if there is such evidence therefrom to conclude that a reasonable mind might fairly find guilt beyond a reasonable doubt…" *United States v. Overmyer*, 867 F.2d 937, 938 (6th Cir. 1989). *See also*, *Jackson v. Virginia,* 443 U.S. 307, 319 (1979). The Government "must present substantial evidence as to each element of the offense." *Brown v. Davis*, 752 F.2d 1142, 1145 (6th Cir. 1985) (internal citations omitted). "Substantial evidence is more than a scintilla. It means such relevant evidence as a reasonable mind might accept to support a conclusion. It is evidence affording a substantial basis of fact from which the fact in issue can be reasonably inferred." *United States v. Martin*, 375 F.2d 956, 957 (6th Cir. 1967). "The government may meet its burden through circumstantial evidence alone, and such evidence need not exclude every possible hypothesis except that of guilt." *United States v. Salgado*, 250 F.3d 438, 446 (citing *United States v. Jackson,* 55 F.3d 1219, 1225 (6th Cir. 1995)). "In assessing the sufficiency of the evidence, 'we do not weigh the evidence, assess the credibility of the witnesses, or substitute our judgment for that of the jury.'" *Id.* (citing *United States v. Wright,* 16 F.3d 1429, 1440 (6th Cir. 1994)).

B. <u>Argument</u>

Jackson was convicted of four Hobbs Act robberies and an attempt-Hobbs Act robbery. These crimes occurred at Walgreens' stores in Oak Park, Dearborn Heights, Southfield, Royal Oak, and Warren. Jackson argues that the government failed to present sufficient evidence from which the jury could conclude that he committed these crimes and the related firearm crimes he was also convicted of. Jackson attacks the government's case by asserting that the government offered no direct evidence of Jackson's guilt.

At trial, the government called more than 20 witnesses to testify about each of the Walgreens' robberies and the subsequent investigations. The government introduced security videos from each of the robberies that captured Jackson walking into each Walgreen's location with his face uncovered, wearing a similar outfit each time. The outfit consisted of the following: a black jacket with reflective stripes on the chest, hood, and back; light gray shoes with white soles and black laces; and either black jogging pants or gray jogging pants. In two of the robberies, Jackson also wore a black winter hat with a pom-pom on top. In the Warren robbery, Jackson wore black jogging pants, which one of the victims described as having elastic cuffs at the bottom.

Several employee-victims from the five Walgreen's testified at trial. Each of the victims described a similar scenario: they were working at Walgreens and

4

when they went to the back manager's office, they were met by a masked man, holding a black semi-automatic handgun. In four of the robberies, the handgun had an extended clip. The masked man demanded money out of the store safe while brandishing the firearm. Through the security videos and the testimony from responding officers and evidence technicians, the government proved that each of the robberies was committed in the same way: a man came into the store, walked over to the cooler area, pushed items off a shelf, crawled through the cooler, and then accessed the secure employee area where he held employees at gunpoint and obtained, or tried to obtain money from the safe. During the last robbery in Warren, Jackson also robbed the pharmacy, obtaining thousands of opioid pills. Greg Lazette, an Asset Protection Manager, testified as to the loss amounts from each Walgreen's location.

    The government also introduced cell phone evidence through an expert witness, FBI Special Agent George Reinerth. SA Reinerth testified that Jackson's phone number connected to cell towers covering the Dearborn Heights Walgreens, the Southfield Walgreens, the Royal Oak Walgreens, and the Warren Walgreens around the time of each of those robberies. Specific to the Warren robbery, SA Reinerth testified that in addition to call detail records, he reviewed Timing Advance data for Jackson's phone number. The Timing Advance data—which shows the distance from a device to the connecting tower—showed that at the time

of the robbery Jackson's cell phone was the same distance from the cell tower as the Warren Walgreens. That data was corroborated by security video from the Warren Walgreens, which showed Jackson walking into the Walgreens at the same time the Timing Advance data put him there.

Law enforcement witnesses also testified about a search warrant that was executed at Jackson's house on Sussex Street approximately a month after the last robbery. These witnesses testified that during the search, they recovered the distinctive black jacket with reflective stripes on the chest, hood, and back, black jogging pants with elastic cuffs at the bottom, grey jogging pants, and a black winter hat with a pom-pom. Excerpts from Jackson's cell phone download were also introduced at trial. One of the photographs from the cell phone extraction depicted Jackson wearing light gray shoes with white soles and black laces.

During the search, law enforcement also recovered a loaded black semi-automatic handgun with an extended clip hidden in the attic above Jackson's bed. DNA analysis revealed that Jackson's DNA profile was on the recovered firearm.

Retired FBI Task Force Officer Paul Kinal testified that on the day the search warrant was executed, he interviewed Jackson. Kinal testified that during the interview, he noticed a raised growth on the left side of Jackson's neck which was substantially similar to a growth on the left side of the perpetrator's neck that was captured on the security video from the Royal Oak robbery.

Finally, although law enforcement did not recover any opioid pills during the search of Jackson's residence, the government admitted text messages between Jackson and "John Aggressive" discussing "oxys." The jury also heard recordings of calls Jackson made while in custody to his girlfriend demanding that she "holler at John" and tell "John" that he and the others "need to shut it down." A reasonable juror could infer from this evidence that Jackson was attempting to get word to his's associates to stop selling OxyContin pills that were stolen during the Warren robbery.

In his brief, Jackson argues there was a lack of evidence relating to certain facts. For example, Jackson takes issue with the fact that "there was no evidence presented that the gun found in the attic was put there by Jackson." (ECF No. 168, PageID.979, 985). However, Jackson's argument misses the mark . First, the question this Court must decide is not what the evidence *didn't* prove. Instead, this Court must only decide whether a rational juror, when looking at the evidence *that was* presented in the light most favorable to the government, *could* find guilt beyond a reasonable doubt. Second, the government was not required to prove that Jackson hid the firearm in the attic. Even if it was, the evidence and rational inferences the jury could draw from the evidence, was overwhelming that Jackson hid the firearm in the attic. For example, the security videos showed Jackson walking into each Walgreens just prior to each robbery; the security videos showed

the perpetrator using a black semi-automatic handgun with an extended clip; a semi-automatic handgun with an extended clip was recovered in the attic above Jackson's bed; the cover to the attic had been removed; the recovered firearm contained Jackson's DNA; and Jackson did not answer the door when law enforcement arrived to execute the search warrant. From this evidence, a rationale juror could find that Jackson possessed that firearm during the robberies and that he attempted to hide ethe firearm in the attic when agents arrived at his house to execute the search warrant.

Jackson claims that his DNA expert's "testimony created doubt and demonstrated the insufficiency of the government's DNA evidence." (ECF No. 168, PageID.986). However, Jackson's DNA expert corroborated much of the testimony offered by the government's DNA expert. Furthermore, to the extent there was a conflict in the testimony between the experts, that does not aid Jackson. "It is the province of the [jury] to weigh the probative value of the evidence and resolve any conflicts in testimony." *Matthews v. Abramajtys,* 319 F.3d 780, 788 (6th Cir.2003).

Jackson also claims that his own testimony supports his Rule 29 motion. However, when a defendant chooses to testify, the jury is "permitted to draw negative inferences from his testimony, and to discredit his version of events and infer his guilt." *United States v. Friedman,* 998 F.2d 53, 57 (2d Cir. 1993).

8

Jackson's testimony was incredible. The jury was entitled to discredit his version of events and infer his guilt.

There was much more evidence presented at trial, but the above recitation demonstrates that there was overwhelming evidence, that when viewed in light most favorable to the government, a rational trier of fact could have found the essential elements of the 11 crimes Jackson was convicted of beyond a reasonable doubt. Therefore, Jackson's motion for judgment of acquittal should be denied.

### III. JACKSON'S MOTION FOR A NEW TRIAL

#### A. Legal Standard

"[T]he court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. Here, it does not. "[T]he defendant bears the burden of proving the need for a new trial and such motions should be granted sparingly and with caution." *United States v. Turner*, 995 F.2d 1357, 1364 (6th Cir.1993). This is a heavy burden to carry. *Id.*, citing *United States v. Davis*, 15 F.3d 526, 531 (6th Cir. 1994). A trial court's decision not to grant a new trial will be affirmed unless it is a clear abuse of discretion. *United States v. Willis*, 257 F.3d 636, 642 (6th Cir. 2001); *United States v. Pierce*, 62 F.3d 818, 833 (6th Cir. 1995).

In *Estelle v. Williams*, 425 U.S. 501 (1976), the United States Supreme Court held that the government "cannot, consistently with the Fourteenth Amendment, compel an accused to stand trial before a jury while dressed in

identifiable prison clothes." *Estelle*, 425 U.S. at 512 (emphasis added). The Supreme Court also concluded that a defendant's "failure to make an objection to the court as to being tried in such clothes, for whatever reason, is sufficient to negate the presence of compulsion necessary to establish a constitutional violation." *Id*. at 512-13.

Relying on *Estelle*, other circuits have "pointed out that trial in prison garb violates the constitution only if the defendant wants to be tried in civilian clothes." *United States v. Arellano*, 137 F.3d 982, 986 (7th Cir. 1998), citing *Duarte v. United States*, 81 F.3d 75, 77 (7th Cir. 1996). "One reason for phrasing the right this way is that some defendants may not care, or may believe that it confers a strategic advantage to appear as a captive. A litigant should not be permitted to seek this advantage (if advantage it is), and then set up the same point as a reason for reversal." *Duarte*, 81 F.3d at 77.

B. <u>Argument</u>

Jackson claims that it was plain error for the court to allow him to testify in his jail clothing while wearing restraints that were visible to the jury. (ECF No. 168, PageID.979, 988). However, Jackson was not compelled to wear jail clothing or visible restraints during trial. Instead, he specifically requested to. Up until the last day of trial, Jackson wore a suit and tie, and his hand restraints were removed. While Jackson wore leg restraints throughout the trial, they were not visible to

10

jurors until Jackson wanted jurors to see them. On the last day of trial—the day Jackson was scheduled to testify—he made a strategic decision to wear jail clothes and refused to change out of his jail clothing and into his suit and tie.

Jackson also requested to testify while handcuffed. Furthermore, Jackson specifically requested that he be allowed to walk from the defense table to the witness box in front of the jury so they could see his leg restraints also. (ECF No. 168, PageID.989).

After a deputy U.S. Marshal notified the Court and parties of Jackson's refusal to get dressed, defense counsel went to speak with Jackson in lock-up. Defense counsel returned to the courtroom after a conversation with Jackson. The parties requested that Jackson be brought into the courtroom so the Court could make a record advising Jackson of his right to wear civilian clothes and his right not to be shackled. The Court did just that.

Jackson—wearing his orange jail jumpsuit—was brought to the courtroom, outside the presence of the jury. On the record, the Court informed Jackson that he had both a right to wear civilian clothes and a right to decide to wear jail clothes. The Court also informed Jackson that he did not need to be handcuffed. Jackson confirmed that he understood each of his rights and was deciding to waive them. Jackson opted to remain in jail clothes and demanded to be handcuffed while testifying.

The government then requested that Jackson be placed in the witness box prior to the jury entering the courtroom so that his hand and leg restraints would not be visible to the jury. Jackson objected. Jackson demanded that the jury see him walk from counsel table to the witness box, shackled and wearing jail attire. The Court reluctantly acquiesced to Jackson's demands and let him remain in restraints wearing jail clothes. The jury was brought into the courtroom and trial resumed. Jackson then walked from the defense table to the witness stand while wearing hand and leg restraints. Consistent with his strategy to elicit sympathy from the jury, Jackson testified—over the government's objection—about his prior criminal history and the length of time he had been detained pending trial.

Jackson now claims that the Court erred by failing to hold an evidentiary hearing before allowing Jackson to wear restraints in front of the jury. (ECF No. 168, Page ID.990). Jackson cites *United States v. Miller*, 531 F.3d 340, 345 (6th Cir. 2008) in support of his assertion. But his reliance on *Miller* is misguided. *Miller*—and nearly every case from the Sixth Circuit dealing with the restraint of a defendant before a jury—is factually dissimilar from this case. In *Miller* and the other cases that analyze the need for an evidentiary hearing, the purpose of the hearing is to establish a clear record about the necessity for the restraint. Here, there was no question to resolve about the necessity of the restraint because the government and the deputy U.S. Marshalls were not requesting that Jackson be

restrained. Instead, it was Jackson who *demanded* that he be restrained.

Jackson used the restraints like a stage prop in his attempt to elicit sympathy from the jury. But because his blatant attempt to manipulate the jury didn't pan out the way he had hoped, Jackson now attempts to use the same appearance as a reason for reversal. To the extent that Jackson's decision to appear before the jury in jail clothing while wearing restraints, raised questions or concerns in any of the jurors' minds, those questions were of his own making. The Court should deny Jackson's motion for a new trial.

## IV.   CONCLUSION

For the reasons stated above, Jackson's motion should be denied.

Respectfully submitted,

DAWN N. ISON
United States Attorney

| | |
|---|---|
| *s/ Mark Bilkovic* | *s/ Barbara K. Lanning* |
| Mark Bilkovic | Barbara K. Lanning |
| Assistant United States Attorney | Assistant United States Attorney |
| 211 West Fort Street, Suite 2001 | 211 West Fort Street, Suite 2001 |
| Detroit, MI  48226 | Detroit, MI 48226 |
| (313) 226-9623 | (313) 963-4311 |
| mark.bilkovic@usdoj.gov | barbara.lanning@usdoj.gov |

Dated: June 15, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2023 I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to counsel of record.

*s/ Mark Bilkovic*
Mark Bilkovic
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, MI  48226
(313) 226-9623
mark.bilkovic@usdoj.gov
